# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARDIONET, LLC, et al., | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 12-2516 |
| | : | |
| THE SCOTTCARE CORPORATION, et al., | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

**Tucker, J.**                                                                October_19___, 2017

Presently before this Court are:

1. Defendants ScottCare Corporation ("ScottCare") and Ambucor Health Solutions, Inc's ("Ambucor") Motion to Exclude the Expert Testimony of Dr. George T. Ligler (Doc. 107);

2. ScottCare and Ambucor's Motion to Exclude the Expert Testimony of Laura B. Stamm (Doc. 110);

3. Plaintiffs CardioNet, LLC ("CardioNet") and Braemar Manufacturing, LLC's ("Braemar") Motion to Exclude the Testimony of Bryan Bergeron Regarding the "King of Hearts" Reference (Doc. 115); and

4. CardioNet and Braemar's Motion to Exclude the Testimony of Michael Lasinski Regarding Non-infringing Alternatives (Doc. 120).

Upon consideration of the Parties' briefs[1] and exhibits, the record of this case, and oral argument held before the Court on June 16, 2015, the Parties' motions are DENIED.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

---

[1] The Court has also considered the Parties' related Opposition and Reply briefs to the above listed motions (Docs. 123, 130, 134, 135, 136, 145, 150, 151, and 156) and The Declaration of Alexandra O. Fellowes in Support of: (1) Plaintiffs' Daubert Motion to Exclude the Testimony of Bryan Bergeron Regarding the "King of Hearts" Reference and (2) Plaintiffs' Daubert Motion to Exclude the Testimony of Michael Lasinski Regarding Non-Infringing Alternatives (Doc. 141).

1

Plaintiffs CardioNet, LLC and Braemar Manufacturing, LLC (collectively, "Plaintiffs" or "CardioNet") bring this patent infringement action against Defendants ScottCare Corporation and Ambucor Health Solutions (collectively, "Defendants" or "ScottCare"), alleging that ScottCare and Ambucor's TeleSentry MCT System ("TeleSentry") infringed on CardioNet's patents. The patents-in-suit are directed to multiple aspects of electrocardiographic ("ECG") telemetry devices. ECG telemetry devices are monitors used to record and transmit the electrical activity of the heart over a period of time. These devices help medical professionals monitor a patient's cardiac activity and detect cardiac irregularities. The cardiac data recorded by the ECG telemetry device is transmitted to a remote location where medical technicians review the information. This information can then be sent to a medical professional for further review and diagnosis.

Plaintiffs maintain that their use of innovative methods and systems has allowed their patented inventions to enable more accurate detection of cardiac irregularities. According to Plaintiffs, the patented inventions also ensure that medically relevant information obtained during ECG monitoring is efficiently processed and made available to trained personnel for review. A brief summary of each patent-in-suit, as construed by Plaintiffs, appears below.

A. The '850 and '996 Patents (Patents Nos. 7,212,850 and 7,907,996)

The '850 and '996 patents disclose systems and techniques relating to processing and presenting arrhythmia event information from physiological data. The patents are directed to methods and systems for effectively reporting information relating to atrial fibrillation events to medical practitioners to assist in treating heart arrhythmia. The '850 and '996 patents enhance and simplify medical review by ensuring that the most relevant information is presented together.

These patents include a novel way of pictographically presenting the information based on a human assessment of events.

### B. The '095 Patent (Patent No. 6,569,095)

The asserted claims of the '095 patent involve techniques that allows a patient to be monitored remotely. This device generates a warning signal when the patient's physiological characteristic, such as a heart rate, exceeds the acceptable limits. Unlike prior heart monitoring devices, this device takes into account the fact that not all warning limits are universally applicable or even applicable for the same patient under all conditions. The '095 patent establishes realistic warning limits that are characteristic of situations that are truly urgent by revising warning limits while the patient is still using the monitor. As a result, there is increased precision in the warnings generated.

### C. The '237 Patent (Patent No. 7,587,237)

The '237 patent involves systems and techniques for analyzing and handling biological signals, such as a patient's cardiac signal. The handling of biological signals includes notifying medical personnel at a remote location in response to the identification of an "event." An "event" is associated with medical conditions, such as atrial fibrillation. From a remote location, medical personnel analyze biological signals prior to handling, which reduces the volume of data requiring handling. This system both minimizes handling costs and ensures that relevant information is not lost. The system accomplishes this by determining whether a given cardiac event is sufficiently meritorious to justify its transmission to a monitoring station for review.

### D. The '207 Patent (Patent No. 7,941,207)

The '207 Patent discloses devices and techniques for monitoring cardiac activity. Specifically, the devices and techniques collect information describing variability in heart beats

and determine whether that variability is indicative of an atrial fibrillation or atrial flutter event. In addition, the claimed devices are designed to monitor cardiac signals of ambulatory patients who are away from controlled environments such as hospital beds or treatment facilities.

Before the Court are a number of motions to exclude the admission of expert testimony regarding the patents-in-suit. For the reasons set forth below, the Parties' motions are DENIED.

## II. STANDARD OF REVIEW

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (2011). The Third Circuit has explained that Rule 702 has three major requirements: the proffered witness must: (1) "be an expert, i.e. must be qualified"; (2) "testify about matters requiring scientific, technical[,] or specialized knowledge"; and (3) present testimony that "assist[s] the trier of fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008). Thus, in order to be admitted, an expert's testimony must demonstrate "qualification, reliability, and fit." *Schneider ex rel. Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). "The party offering the expert must prove each of these requirements by a preponderance of the evidence." *Mahmood v. Narciso*, 549 F. App'x 99, 102 (3d Cir. 2013) (citing *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999)).

Rule 702 has "a liberal policy of admissibility." *Pineda*, 520 F.3d at 243 (quoting

*Kannankeril v. Terminix Intern., Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). As such, the "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Exclusion of expert testimony is the exception rather than the rule because "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citing *Daubert v. Merrell Dow Pharm.*, *Inc.*, 509 U.S. 579, 596 (1993)).

### III. DISCUSSION

#### A. ScottCare and Ambucor's Motion to Exclude the Expert Testimony of Dr. George T. Ligler is Denied.

Defendants ScottCare and Ambucor (collectively, "ScottCare") argue that this Court should exclude the testimony of Dr. George T. Ligler, one of Plaintiffs' proffered infringement experts, because he is not qualified as a "person of ordinary skill in the art" or "POSITA." A POSITA is a "hypothetical person who is presumed to know the relevant prior art." *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). It is a legal construct in patent law that serves as a reference for evaluating patent claims. ScottCare claims that Dr. Ligler's opinions and testimony must be excluded because he meets neither ScottCare nor CardioNet's definition of a POSITA.

CardioNet, by contrast, does not dispute whether Dr. Ligler falls under either party's definition of a POSITA but rather argues that "the conceptual POSITA framework in patent law does not supplant Rule 702 in determining the admissibility of expert testimony. Accordingly, an expert does *not* need to meet the qualifications of a POSITA in order to offer expert testimony." (Pls.' Opp'n to Defs.' Mot. to Exclude Test. Ligler 6., Doc. 130). For the reasons set forth below, Dr. Ligler's testimony will not be excluded.

5

Whether Dr. Ligler satisfies the Parties' definition of a POSITA is not determinative of whether the Court should permit Dr. Ligler to testify. *See Sundance, Inc. v. DeMonte Fabricating Ltd.,* 550 F.3d 1356, 1363 (Fed. Cir. 2008) (stating that the "[a]dmission of expert testimony remains subject to the Rules of Evidence and is committed to the discretion of the district court") (citing Fed. R. Evid. 702)). In *SEB S.A. v. Montgomery Ward & Co.*, the Federal Circuit reaffirmed that the Federal Rules of Evidence govern the admissibility of expert testimony, not whether the witness meets the parties' definition of a POSITA. 594 F.3d 1360, 1373 (Fed. Cir. 2010). In *SEB S.A.*, the Federal Circuit determined that the trial court did not abuse its discretion by admitting expert testimony in a patent dispute involving the insulated skirt of a deep fryer, despite the fact that the expert "testified that he is not skilled in designing deep fryers." *Id*. at 1373. The court reasoned that:

> Although [the expert] testified that he is not skilled in designing deep fryers, [he] explained that **his experience was relevant** because the claimed invention 'involves the selection of particular . . . polymer material that have certain characteristics' and that '[m]ost of the areas [he has] worked in . . . have used polymers in one form or another.' . . . In light of the court's claim construction . . . **[the expert's] testimony established an adequate relationship between his experience and the claimed invention.**

*Id.* at 1373 (emphasis added). In reaching its conclusion, the Federal Circuit expressed that "the district court was in the best place to judge that [the expert] had the 'knowledge, skill, experience, training, [and] education' of a 'specialized' nature that was likely to 'assist the trier of fact to understand the evidence or to determine' infringement." *Id.* (quoting Fed. R. Evid. 702). The court also noted that "[t]his case comes nowhere close to the unusual situation in [*Sundance*]" where the district court admitted the testimony of an expert despite the absence of any suggestion of relevant technical expertise. *Id.* In *SEB S.A.*, "[the expert] had sufficient relevant technical expertise for the district court to allow him to testify." *Id.*

6

Unlike the "unusual situation" in *Sundance*, Dr. Ligler has demonstrated that he possesses the technical expertise necessary to assist the trier of fact. Although the patents at issue relate to cardiac monitoring, they are largely implemented using traditional computer system technologies. Dr. Ligler's deposition testimony demonstrates that he is qualified to perform infringement analysis in this case. During his deposition, Dr. Ligler was able to knowledgeably discuss various components of the TeleSentry and describe their functions and how they work. In addition, Dr. Ligler has experience and specialized knowledge in computer systems and source code (Ligler Dep. 19:20–20:6), has worked with pulse oximeters over the course of two and a half years, and has decades of experience in signal processing (Ligler Dep. 18:4–6, 20:25–21:10, 31:20–22). Dr. Ligler also has experience with heartbeat detection algorithms like the one used in the TeleSentry. (Ligler Dep. 34:12–36:7). In light of Dr. Ligler's qualifications and experience, the Court finds that Dr. Ligler possesses specialized knowledge that will assist the trier of fact in understanding the evidence and determining the issue of infringement. Therefore, Dr. Ligler's testimony will not be excluded.

**B. ScottCare and Ambucor's Motion to Exclude the Expert Testimony of Laura B. Stamm is Denied.**

ScottCare argues that the report of Laura B. Stamm, CardioNet's proposed damages expert, should be excluded because Ms. Stamm: (1) bases her claim for damages on the entire TeleSentry device rather than the allegedly infringing components within the device; and (2) assigned arbitrary royalty rates for the patents-at-issue without any discernable methodology and without considering the unique value of each CardioNet patent or whether ScottCare actually uses those features. (Defs.' Mot. to Exclude. Test. Stamm 2.)

CardioNet counters that Ms. Stamm was not required to apportion her basis for damages because Ms. Stamm has provided evidence to show that the TeleSentry is not a multi-component

7

product. According to CardioNet, ScottCare's argument that the TeleSentry is a multi-component product creates a disputed fact for the factfinder. Further, CardioNet contends that apportionment is not necessary where, as here, lost profits are determined under the *Panduit* factors. Finally, CardioNet maintains that Ms. Stamm reasonably estimated the royalty rates using the 15-factor framework articulated in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, which CardioNet claims is a widely accepted methodology. 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

Ms. Stamm's testimony regarding lost profit damages and royalty rates will not be excluded because whether CardioNet is required to apportion damages requires a factual finding that the TeleSentry is a multi-component device. At this juncture, that fact is in dispute. Further, even if the TeleSentry is deemed a multi-component device requiring apportionment, the apportionment requirement may be satisfied using the *Panduit* factors. Whether Ms. Stamm has satisfied the *Panduit* factors is a determination that must be made by the trier of fact. Finally, the Court finds that Ms. Stamm provided sufficient basis for her reasonable royalty calculations. Therefore, Ms. Stamm's testimony will not be excluded.

1. **Lost Profit Damages**

    a. **Apportionment is required where the infringing product contains both patented and unpatented components.**

In a patent infringement suit, the measure of damages is an amount that will compensate the patent owner for the pecuniary loss sustained as a result of the infringement. 35 U.S.C.A. § 284 (West 2012). The Federal Circuit has consistently held that where an infringing product is a multi-component product with patented and unpatented components, apportionment is required. *Eriscsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) ("When the accused infringing products have both patented and unpatented features, measuring this value requires a

determination of the value added by such features. Indeed, apportionment is required even for non-royalty forms of damages."); *Virnetx, Inc., v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) ("No matter what the form of the royalty, a patentee must take care to seek only those damages attributable to the infringing features."). The United States Supreme Court has also acknowledged the apportionment requirement. In *Garretson v. Clark*, the Supreme Court observed that a patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative . . . ." 111 U.S. 120, 121 (1884).

### b. The apportionment requirement may be satisfied using the *Panduit* factors.

The Federal Circuit has recently held that, in certain cases, the apportionment requirement may be satisfied using the *Panduit* factors. *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275 (Fed. Cir. 2017). Under *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, the patentee is entitled to lost profits if the patentee can show: (1) demand for the patented product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of the profit it would have made. 575 F.2d 1152, 1156 (6th Cir. 1978). *Mentor Graphics Corp.*, 851 F.3d at 1275. In *Mentor Graphics Corp.*, as in this case, the defendant argued that in addition to satisfying the *Panduit* factors, the plaintiff was required to apportion its lost profits to cover only the profit that was attributable to the plaintiff's patent. *Mentor Graphics Corp.*, 851 F.3d at 1258. The Federal Circuit rejected the defendant's argument because the jury was instructed to consider the *Panduit* factors, including "demand for the patented product" (factor one) and an "absence of acceptable non-infringing alternatives" (factor two). *Id.* at 1284–1288.; *see Panduit Corp.*, 575 F.2d at 1156. The Federal Circuit held

that these two factors together consider demand for the patented product as a whole and demand for particular limitations or features of the claimed invention. *Mentor Graphics Corp.*, 851 F.3d at 1285 (citing *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1330–31 (Fed. Cir. 2009)). These two factors considered together "tie[] lost profit damages to specific claim limitations and ensures that damages are commensurate with the value of the patented features." *Id.* Thus, "when the *Panduit* factors are met, they incorporate into their very analysis the value properly attributed to the patented feature." *Id.* at 1290.

In the present case, ScottCare seeks to exclude the testimony of Ms. Stamm because, according to ScottCare, Ms. Stamm has failed to apportion damages. However, ScottCares contention is premature because the parties dispute whether the TeleSentry is a multi-component device. Ms. Stamm maintains that apportionment is not necessary because the TeleSentry is used only for cardiac monitoring; therefore, the TeleSentry System is not a multi-component product. Ms. Stamm's failure to apportion damages is not a valid basis for excluding Ms. Stamm's testimony because if the trier of fact concludes that the TeleSentry is not a multi-component device, apportionment is not necessary.

Further, in light of the Federal Circuit's holding that the apportionment requirement may be satisfied using the *Panduit* factors, the Court cannot conclude that Ms. Stamm's methodology is flawed do to her failure to apportion damages because Ms. Stamm has relied on the *Panduit* factors to demonstrate CardioNet's entitlement to lost profits. Whether CardioNet has satisfied the *Panduit* factors is a highly factual determination that must be made by the trier of fact. Therefore, Ms. Stamm's testimony regarding lost profits will not be excluded.

**2. Reasonable Royalty**

Finally, ScottCare argues that Ms. Stamm's testimony should be excluded because she arbitrarily assigned royalty rates without any explanation. Establishing a reasonable royalty "is not an exact science." *Apple, Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1313-26 (Fed. Cir. 2010). Factors relevant to the determination of a reasonable royalty are set forth in *Georgia-Pacific Corp*. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("This court has sanctioned the use of the *Georgia-Pacific* factors to frame the reasonable royalty inquiry.").

The Court finds that Ms. Stamm has provided sufficient basis for her reasonable royalty calculations. Ms. Stamm's report contains a total of forty-five pages of analysis in which she considered a market, income, and cost valuation approach, and applied the *Georgia-Pacific* factors to the facts of this case using the hypothetical negotiation construct. Applying this methodology, Ms. Stamm concluded that a 15% royalty rate for the entire portfolio was reasonable. Ms. Stamm then assigned the following royalty rates for the individual patents-at-issue: 7% for the first patent, 4% for the second patent, and 2% for each of the third and fourth patents. While ScottCare argues that this "layering of rates" is arbitrary, CardioNet explains that it reflects the fact that when a license is negotiated for a patent portfolio there is, in effect, a royalty rate reduction for the patents after the first patent is licensed. The Court finds that Ms. Stamm has applied acceptable methodology in assigning reasonable royalty rates for the patents-at-issue. ScottCare's contention with Ms. Stamm's report is an issue that may be dealt with through the presentation of contrary evidence and cross-examination. *See Daubert*, 509 U.S. at 596 (stating that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky

but admissible evidence"). Therefore, the Court will not exclude Ms. Stamm's testimony at this juncture.

   C. **CardioNet and Braemar's Motion to Exclude the Testimony of Bryan Bergeron Regarding the "King of Hearts" Reference is Denied.**

ScottCare offers the testimony of Dr. Byran Bergeron regarding the validity of the patents-at-issue. According to Dr. Bergeron, the patents-at-issue are invalidated by the King of Hearts system. In forming his opinions, Dr. Bergeron relied exclusively on the testimony of Dr. Lev Korzinov. CardioNet contends that because uncorroborated testimony alone is insufficient, as a matter of law, to invalidate a patent claim, Dr. Bergeron's testimony is unreliable and should be excluded pursuant to Federal Rules of Evidence 702, 703, and 403.

The law disfavors invalidating patents on the basis of mere testimonial evidence absent other evidence that corroborates that testimony. *Finnigan Corp, v. Int'l Trade Comm'n*, 180 F.3d 1354, 1369 (Fed. Cir. 1999). Corroboration is required of any witness whose testimony alone is asserted to invalidate a patent, regardless of his or her level of interest. *Tex. Dig. Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1217 (Fed. Cir. 2002). The United States Supreme Court introduced the corroboration requirement "because of doubt that testimonial evidence alone in the special context of proving patent invalidity can meet the clear and convincing evidentiary standard to invalidate a patent." *Finnigan Corp.* 180 F.3d. at 1368.

CardioNet argues that Dr. Bergeron's testimony should be excluded because no reasonable jury instructed on the law could conclude that the patents-at-issue are invalid based on legally insufficient oral testimony. However, this argument unreasonably assumes that Dr. Bergeron and Dr. Korzinov's testimonies will be the only evidence presented to the jury with respect to the issue of invalidity. Furthermore, CardioNet's argument is misguided because, at this stage of the litigation, the sufficiency of the evidence to establish invalidity is not at issue;

the Court has not been tasked with assessing whether ScottCare has satisfied its burden of proving the invalidity of the patents-at-issue. That assessment is a task that must be performed by the trier of fact after both parties have been afforded an opportunity to present evidence.

The question before the Court is whether the expert testimony of Dr. Bergeron regarding the King of Hearts System should be excluded because it is unreliable. Thus, this inquiry is governed by Rule 702, as interpreted by *Daubert*, and Rule 703.

1. **Rule 702 Analysis**

In determining whether to admit expert testimony under Rule 702 the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. An expert's opinion is reliable under Rule 702 if it is based on "good grounds," that is, if it is based on the methods and procedures of science. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994). "The grounds for the expert's opinion merely have to be good, they do not have to be perfect." *Id.* The Third Circuit has cautioned that "the reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence." *Id.* Further, the Federal Rules of Evidence "embody a strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact and for dealing with the risk of error through the adversary process." *DeLuca v. Merrell Dow Pharm., Inc.*, 911 F.2d 941, 956 (3d Cir. 1990) (citation omitted).

The Court finds that Dr. Bergeron's opinions regarding the King of Hearts system are reliable. CardioNet has not stated any basis upon which Dr. Bergeron's testimony may be excluded pursuant to Rule 702 because CardioNet has not asserted any challenge to the methods or principles used by Dr. Bergeron in reaching his conclusions. *See Daubert*, 509 U.S. at 595. Instead, CardioNet essentially challenges the sufficiency of ScottCare's evidence in establishing

13

the invalidity of the patent-at-issue. Dr. Bergeron has concluded that certain patents-at-issue are invalid because the King of Hearts device performed many of the supposedly "novel" functions of said patents. In reaching this conclusion Dr. Bergeron relied exclusively on the testimony of Dr. Korzinov. Dr. Korzinov is the former Chief Scientist of CardioNet and the inventor of the King of Hearts device and several of the patents-at-issue. As the inventor of the King of Hearts and the patents-at-issue, Dr. Korzinov arguably knows more about the differences and similarities between these devices than any other technical expert. Therefore, the Court finds that reliance on Dr. Korzinov's testimony was reasonable, and such reliance renders Dr. Bergeron's testimony reliable and helpful to the trier of fact. Whether ScottCare's evidence is sufficient to satisfy the clear and convincing evidence standard for proving invalidity is a question that must be answered after ScottCare has had an opportunity to present its evidence.

2. **Rule 703 Analysis**

While Rule 702 focuses on an expert's methodology, Rule 703 focuses on the data underlying the expert's opinion. Under Rule 703:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Fed. R. Evid. 703. In determining reliability under Rule 703, the proper inquiry is whether the expert is basing his or her opinion on a type of data reasonably relied upon by experts in the relevant discipline. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 747. "[W]hen a trial judge analyzes whether an expert's data is of a type relied on by experts in the field, he or she should assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert." *Id.* at 749.

CardioNet does not assert that the facts that Dr. Bergeron considered are not relied upon by technical experts in rendering their opinions. In fact, CardioNet's own expert, Ms. Stamm, relied upon Dr. Korzinov's testimony in forming her opinions. *See* Stamm Report ¶ 65, Doc. 201. Given Dr. Korzinov's extensive knowledge of the King of Hearts device and the patents-at-issue the Court finds that there were good grounds to rely on Dr. Korzinov in drawing a conclusion regarding the validity of the patents-at-issue. Further, the Court finds that sworn testimony of the inventor of a patent is the type of evidence technical experts rely upon in forming their opinions. Thus, Dr. Bergeron's testimony satisfies the requirements of Rule 703. *DeLuca*, 911 F.2d at 953 ("Rule 703 is satisfied once there is a showing that an expert's testimony is based on the type of data a reasonable expert in the field would use in rendering an opinion on the subject at issue . . . .").

### 3. Rule 403 Analysis

CardioNet contends that Dr. Bergeron's testimony is highly prejudicial and should be excluded pursuant to Rule 403 because Dr. Bergeron relies solely on evidence that is insufficient as a matter of law.

The Court may exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury. Fed. R. Evid. 403. However, excluding evidence as being more prejudicial than probative at the pretrial stage is an extreme measure that is rarely necessary because no harm is done by admitting it at that stage. *In re Paoli R.R. Yard PCB Litigation*, 916 F.2d 829, 859 (3d Cir. 1990). If testimony survives scrutiny under Rules 702 and 703, Rule 403 is an unlikely basis for exclusion. *Id.*

At this juncture, the Court does not find any prejudicial value in Dr. Bergeron's testimony. The fact that Dr. Bergeron exclusively relied on the testimony of Dr. Korzinov in

forming his conclusion does not, in and of itself, prejudice CardioNet. CardioNet contends that allowing Dr. Bergeron to offer his opinions would prejudice CardioNet because a jury is likely to overvalue Dr. Korzinov's testimony because an expert (Dr. Bergeron) is parroting it. However, CardioNet will have an opportunity to cross-examine Dr. Bergeron and question Dr. Bergeron's basis for his opinion. In addition, CardioNet will have an opportunity to offer its own experts to discredit Dr. Bergeron's opinion. However, the mere fact that Dr. Bergeron exclusively relied on Dr. Korzinov's testimony does not prejudice CardioNet. Finally, in light of clear Third Circuit precedent, the Court will not exclude Dr. Bergeron's testimony pursuant to Rule 403 because Dr. Bergeron's testimony has survived scrutiny under Rules 702 and 703.

**D. CardioNet and Braemar's Motion to Exclude the Testimony of Michael Lasinski Regarding Non-infringing Alternatives is Denied.**

CardioNet argues that the opinions of Michael Lasinski must be excluded as unreliable. For the reasons that follow, the Court denies CardioNet's Motion to Exclude Mr. Lasinki's opinion. ScottCare offers Mr. Lasinski's testimony in order to support its position that damages in the form of lost profits are not appropriate in this case because there were available, non-infringing alternatives. ScottCare also offers Mr. Lasinski's testimony to rebut CardioNet's calculation of a reasonable royalty. CardioNet argues that Lasinski's testimony should be excluded because, while Mr. Lasinski's opinions are based on the availability of non-infringing alternatives to the TeleSentry, ScottCare has failed to establish that the non-infringing alternatives proposed by ScottCare would have been "available" and "acceptable."

To recover lost profits a patentee must demonstrate that "but for" a defendant's infringement, the patentee would have made additional profits. *Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999). As part of a patentee's burden of establishing this causal link, a patentee must establish the absence of acceptable non-infringing

substitutes. *Panduit Corp.*, 575 F.2d at 1156. This factor is important in determining whether a patentee is entitled to lost profits because this construction of damages, to be accurate, must take into account the alternative actions the infringer foreseeably would have undertaken had he not infringed. *Grain Processing Corp.*, 185 F.3d at 1350–51. "Without the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether." *Id.* at 1351. Thus, an infringer may preclude lost profits if it can establish that it could have offered its customers a non-infringing alternative product.

To preclude lost profits, an alternative product must have been both "available" and "acceptable" to purchasers of the accused infringer. To be available, the alternative product need not have actually been produced or on sale during the infringement period. *Grain Processing Corp.*, 185 F.3d at 1351. Where the product was not on sale during the infringement period, several factors are considered in assessing availability. These factors include whether the accused infringer has "the necessary equipment, know-how, and experience" to produce the non-infringing alternative. *Micro Chemical Inc., v. Lextron, Inc.*, 318 F.3d 1119, 1123 (Fed. Cir. 2003). Acceptability may be established by demonstrating that claim limitations could have been omitted from the accused product in a manner that would have been acceptable to the alleged infringer's consumers. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc*. 567 F.3d 1314, 1330 (Fed. Cir. 2009).

Mr. Lasinski has concluded that damages in the form of lost profits are not appropriate because there were available, non-infringing alternatives to the TeleSentry. In reaching this conclusion Mr. Lasinski relied on information obtained from ScottCare's employees and technical expert—all of whom are expected to testify at trial—regarding the feasibility,

17

availability, and acceptability of implementing non-infringing alternatives. CardioNet argues that the foundation upon which Mr. Lasinski's opinions rest is legally insufficient to establish availability and acceptability. According to CardioNet, "Mr. Lasinki's opinions with regard to lost profits (and certain of his opinions with respect to reasonable royalties) are predicated entirely on the legally unsound proposition that there were 'available, acceptable non-infringing alternatives' to the TeleSentry system. As discussed *supra*, this is not true." (Pls.' Mot. to Exclude Test. Bergeron 9, Doc. 115.) However, CardioNet's argument does not challenge Mr. Lisinski's principles or methodology. For example, CardioNet does not dispute that available non-infringing alternatives should be considered when determining whether damages in the form of lost profits are appropriate. Instead, CardioNet disagrees with Mr. Lasinki's conclusion that there were available non-infringing alternatives. As such, CardioNet's argument is primarily a factual dispute.

In determining whether to admit expert testimony, the primary consideration is whether the expert's principles and methods are reliable. *See Daubert*, 509 U.S. at 595; *see also Pineda*, 520 F.3d at 244 ("[An] expert's testimony is admissible so long as the process or technique the expert used in formulating the opinion is reliable."). In deciding whether to exclude an expert's testimony the Court cannot consider the veracity of the factual underpinnings of the expert's conclusion. The truthfulness and accuracy of such factual underpinnings are issues that must be determined by the trier of fact.

Whether an alternative product would have been available and/or acceptable during the infringement period are factual determinations. *See Grain Processing Corp.*, 185 F.3d at 1353 (classifying availability and acceptability as "factual findings"). As such, these determinations must be made by the trier of fact after ScottCare has had an opportunity to present evidence

18

supporting the underlying facts that form the basis for Mr. Lasinki's opinions. Therefore, CardioNet's Motion to Exclude Mr. Lasinki's testimony is denied.

## IV. CONCLUSION

For the reasons set forth above, ScottCare's Motion to Exclude the Expert Testimony of Dr. George T. Ligler, ScottCare's Motion to Exclude the Expert Testimony of Laura B. Stamm, CardioNet's Motion to Exclude the Testimony of Bryan Bergeron Regarding the "King of Hearts" Reference, and CardioNet's Motion to Exclude the Testimony of Michael Lasinski Regarding Non-infringing Alternatives are DENIED.

An appropriate order follows.